HENRY P. WILSON, Administrator of the Estate of Lawrence Eugene Wilson, Deceased,
*Plaintiff and Appellant,*

vs.

CITY OF LARAMIE, WYOMING, a Municipal Corporation, and Herbert Amonly Conger,
*Defendants and Respondents.*

MR. and MRS. ALFRED HALSTEAD as individuals and as the parents and natural guardians and next friend of Larry Halstead,
*Plaintiffs and Appellants,*

vs.

CITY OF LARAMIE, WYOMING, a Municipal Corporation, and Herbert Amonly Conger,
*Defendants and Respondents.*

(Nos. 2409 and 2410; November 9, 1948; 199 Pac. 2d. 119)

For the Appellants, the causes were submitted upon the brief and also oral argument of A. Joseph Williams of Cheyenne, Wyoming, and G. R. McConnell of Laramie, Wyoming.

For the Respondents, the cause was submitted upon the brief of Alfred M. Pence and David N. Hitchcock, both of Laramie, Wyoming, and oral argument by Mr. Hitchcock.

238

## OPINION

BLUME, Justice.

Two actions were consolidated for argument in this court, both brought against the City of Laramie, a municipal corporation, and Herbert Amonly Conger. One action was brought by Henry P. Wilson, as Administrator of the Estate of Lawrence Eugene Wilson, a minor, for damages on account of the death of said minor in an accident hereinafter mentioned. The other action was brought by the father and mother of Larry Halstead, for damages on account of injuries sustained by their child, Larry Halstead, a minor, in the same accident. A general demurrer, filed by the defendants to the amended petitions in the case, was sustained by the trial court on the ground that the petitions did not state facts sufficient to constitute a cause of action, and the plaintiffs have appealed to this court. It is not claimed here that the defendant Conger is liable for damages unless the City of Laramie also is, and we shall therefore consider the subject from that standpoint without considering any liability on the part of the defendant Conger.

The second amended petition in the Wilson case alleges in substance the following facts: The City of Laramie is a municipal corporation, and has general supervision over the pipes and conduits for supplying water to the inhabitants thereof. Prior to the date of the accident herein, the City was engaged in cutting down and lowering the grades of certain streets. In doing so, it uncovered and exposed water pipes and

gas pipes belonging to the Rocky Mountain Gas Company. Hence it was necessary to excavate trenches in the streets in order to replace the pipes above mentioned. The Rocky Mountain Gas Company performed the work of excavating trenches, but the City back-filled them, and, in doing so, used a Caterpillar tractor equipped with dozer and scraper equipment. The tractor was operated by the defendant Conger. On July 12, 1941, Conger, after having used the Caterpillar tractor for backfilling as above mentioned, parked it on a slope or hill of a vacant lot adjacent to where the work was done and left it unguarded. He "backed said Caterpillar tractor on said hill, with the gears engaged, the dozer and scraper raised, and without any safety device to hold said tractor where it was parked. It was placed by defendant Conger so that when he returned to work, the clutch could be pushed out and the Caterpillar tractor, of its own weight would roll down the hill and then by engaging the gears would cause the engine to start of its own accord, thus avoiding the cranking of said Caterpillar tractor engine." Prior to and on July 12, 1941, one of the lots bordering on the place where the tractor was parked, and other lots adjacent thereto, were used by children as a playground. The tractor was attractive to and dangerous to children. Previously, children had followed the tractor and had been warned not to be around it. After the tractor had been parked and left unguarded, the deceased, Lawrence Eugene Wilson, and other boys climbed onto the tractor and commenced to play thereon. Larry Halstead, a young boy of four years of age, who was with them, "disengaged the gears and brakes of said tractor by manipulating the hand levers controlling said portions of the tractor." The tractor commenced to roll down the hillside out of control. The boys were greatly frightened and the deceased, in attempting to climb

off the tractor as it rolled down the hillside was so badly crushed and mangled by the tractor that he died as a consequence thereof on July 12, 1941. The tractor could have been rendered safe and harmless to children of tender years, but this was not done. Damages were asked in the sum of $21,245. The allegations in the amended petition in the Halstead case are similar to the allegations in the second amended petition of the Wilson case, except only that it is alleged that Larry Halstead, a minor, four years of age, was injured while trying to escape from the Caterpillar tractor, and damages were asked in the sum of $10,161.20.

I.   Counsel for the plaintiffs contend, and it is specifically alleged in the amended petitions that the Caterpillar tractor was engaged in work in connection with the water system and the gas system in the city. That, in a sense, is of course true. However, to determine the real nature of the work, all of the allegations of the petition must be construed together. It appears therefrom that the City was engaged in cutting down and lowering the grades of certain streets; that, in doing so, it uncovered and exposed pipes and conduits of the water system and the gas system, and in order to remedy that situation, it was necessary to excavate trenches in these streets to replace the pipes. The City was not permitted, at the risk of liability for defects, (Opitz vs. Town of Newcastle, 35 Wyo. 358, 249 Pac. 799) to leave the streets with the pipes or the trenches uncovered. It had to find some way in which to remedy the situation which it created by reason of the lowering of the grade of the streets and the excavations in connection therewith. It either had to remove the pipes from the streets, or to dig or cause to be dug trenches in which they could be laid. The work in connection with the water system and the gas system accordingly was merely an inci-

dental portion of the main thing which the city undertook to do. We think, accordingly, that the work done by the Caterpillar tractor was in connection with the lowering of the grade, which, we take it, was work in the nature of an improvement of the streets of the city. That was evidently the view taken by the trial court and was the view taken in the original petition filed in this case.

II. Law writers generally are against immunity from liability for torts on the part of governments, governmental divisions or governmental agencies, arguing that the burden of damage as a result of such torts should be distributed among the community at large, and that individual sacrifice in such case is not warranted. See E. M. Borchard, 34 Yale Law Journal 1-45, 129-143, 229-254, and article by Leon Green in 38 Illinois Law Review, page 355, and other articles mentioned at that place. In the annotation of 75 A. L. R. 1196, the author states that: "The whole doctrine of governmental immunity from liability for torts rests upon a rotten foundation." Still the author is compelled to admit that:

"it is a well-settled general rule in this country that a municipal corporation is not liable for the negligence of its officers, agents, or servants in the exercise of public or governmental functions, from which it derives no profit or advantage, as distinguished from corporate or proprietary functions, and that the rule of respondeat superior does not apply in such cases."

See 38 Am. Jur. 261; 37 Am. Jur. 727; also Annotations in 120 A. L. R. 1376. And in Niblock vs. Salt Lake City, 100 Utah 573, 111 Pac. 2d 800, 801, the court stated that: "It is generally recognized throughout this country and in England that in the absence of a statute a municipality is not liable for the negligent acts of its servants while they are engaged in performing a governmental function or duty." See also

McQuillin, Municipal Corporations (2nd Ed.), Vol. 6, Section 2793. The foregoing principle was applied by this court in White vs. City of Casper, 35 Wyo. 371, 249 Pac. 562, in connection with negligence in driving a fire truck, and in Villalpando vs. City of Cheyenne, 51 Wyo. 300, 65 Pac. 2d 1109 in connection with negligence in sprinkling streets in the city.

In 3 Dillon on Municipal Corporations (5th Ed.), 1807-1808, the author states that the power to open and improve streets is legislative in its origin. Edwin M. Borchard, in 34 Yale Law Journal, 229, states: "Probably no function of a municipal corporation is more 'governmental' in character than the care of its highways, streets and bridges. In theory, therefore, the city should be immune from responsibility for negligence in such matters; and such was the common law." See also Salmond on Torts (9th Ed.) 298. The author in the Annotation in 120 A. L. R. 1381, speaking of injuries resulting from defects or obstructions in streets, states as follows:

"If liability or nonliability were made to depend upon the usual test of governmental or proprietary functions, it would seem clear that there would be no liability, as no activity of a modern municipality is more purely governmental than the maintenance of public streets. It seems highly artificial to say, as do some of the courts, that the maintenance of streets is a 'ministerial' duty, and is not governmental in character."

In almost all the states, however, either under a statute or otherwise, municipal corporations are liable for damages for injuries sustained by reason of defects in streets. See 7 McQuillin, Municipal Corporations, Section 2904. We followed the rule generally prevailing in the country in Opitz vs. Newcastle, 35 Wyo. 358, 249 Pac. 799, a decision foreshadowed in the case of Ramirez vs. City of Cheyenne, 34 Wyo. 67,

241 Pac. 710. Many courts have considered the rule of liability in such cases as an "illogical exception" to the general rule. But to leave a street in a defective condition is one thing, for such condition is, at least after a reasonable time, a nuisance in the true sense of that term. Pollock on Torts (13th Ed.) 320; Khoury vs. Saratoga County, 243 App. Div. 195, 277 N.Y.S. 3, affirmed in 267 N. Y. 384, 196 N. E. 299; McFarlane vs. City of Niagara Falls, 247 N. Y. 340, 344, 160 N. E. 391. To make improvements on a street, presumably for the welfare of the people, is another matter. So the question before us is as to whether or not the foregoing "illogical exception" should be extended to a case like that at bar, or to make a further exception, as has been done by a number of courts. See 6 McQuillin, supra, Section 2805.

In 6 McQuillin, supra, Section 2793, the author states: "In constructing and improving public streets and highways, the municipal corporation acts in a governmental capacity and is not liable for negligence." And that such work is done in a governmental capacity is held (limiting our citations to one from any jurisdiction) in Municipal Bond Co. vs. City of Riverside, 138 Cal. App. 267, 32 Pac. 2d 661; Ackeret vs. Minneapolis, 129 Minn. 190, 151 N. W. 976; Tierney vs. Correia, 120 Conn. 140, 180 Atl. 282; Fournier vs. City of Berlin, 92 N. H. 142, 26 Atl. 2d 366, 140 A. L. R. 1054; Woodcock vs. City of Calais, 66 Maine 234; Barney vs. Lowell, 98 Mass. 570; Bates vs. Rutland, 62 Vt. 178, 20 Atl. 278, 9 L. R. A. 363; Szilagyi vs. City of Bethlehem, 312 Pa. 260, 167 Atl. 782, Casey vs. Bridgewater Twp., 107 N. J. L. 163, 151 Atl. 603; Morgan vs. City of Logan, 125 W. Va. 445, 24 S. E. 2d 760; Kansas City Bridge Co. vs. Ala. State Bridge Corp., 59 Fed. 2d 48; Atkin vs. Kansas, 191 U. S. 207; 24 S. Ct. 124, 48 L. Ed. 148. One of the leading cases on the subject, and holding as stated above, is Wooster

vs. Arbenz, 116 Ohio St. 281, 156 N. E. 210, 52 A. L. R. 518. And in accordance with that principle, it is held, not however without exception, that a municipality is not liable for the negligence of one operating a vehicle in improving a street, since it is used in a governmental capacity. Wooster vs. Arbenz, supra; Kohake vs. Cincinnati, 59 Ohio App. 403, 18 N. E. 2d 501; Niblock vs. Salt Lake City, supra; Board, etc. vs. Fox, 142 Ky. 476, 134 S. W. 883, 32 L. R. A. N. S. 636; Wrighton vs. Highland Park, 236 Mich. 279, 210 N. W. 250; DeBaere vs. Oconto, 208 Wis. 377, 243 N. W. 221; Barney vs. Lowell, 98 Mass. 570; Pelletier vs. Beverly, 292 Mass. 468, 198 N. E. 772, Hall vs. Concord, 71 N. H. 367, 52 Atl. 864, 58 L. R. A. 455. See also Wray vs. City of Independence, 150 Kan. 258, 92 Pac. 2d 84. And, see 25 Am. Jur. 399; 38 Am. Jur. 309; also Annotations in 52 A. L. R. 524 and 110 A. L. R. 1126. While our holding in the case of Opitz vs. Newcastle, supra, was justified on the ground that substantially all the courts in our country hold a municipality liable for injuries sustained by reason of defects in a street, the same reason, in view of the foregoing authorities, does not exist for creating a further exemption in a case like that at bar.

III. Counsel for petitioners, however, contend that even though the city was engaged in a governmental function, it is nevertheless liable for the negligence in this case in view of the fact that the Caterpillar tractor was an attractive nuisance. The case of Reichvalder vs. Borough of Taylor, 322 Pa. 72, 185 Atl. 270, seems to sustain that contention. In that case, a child of ten years of age played on a road scraper. The scraper consisted of a heavy iron frame work suspended on four wheels with a large blade in the center. The blade was lowered and raised by turning two iron fly wheels which operated cogs. Other children who were playing on the machine turned the wheels and the hand of

the boy plaintiff was caught in the cogs and injured. The scraper had been placed on a vacant lot not far from the highway. The scraper was used in grading a street. The court held that although the municipality was engaged in a governmental function, the scraper should, nevertheless, have been secured in such a way so that the injury involved would not have occurred. In the later Pennsylvania case of Rapczynski vs. W. T. Cowan, 138 Pa. Superior Ct. 392, 10 Atl. 2d 810, 815, the court considered the question of an attractive nuisance, and held that a truck left on a street with the brakes set, but the ignition-key left in the car, was not an attractive nuisance, so as to make the defendant liable for injuries occurring to a child who apparently fell off the truck after it had been started across the street by another boy. The court, in discussing the doctrine of attractive nuisances, stated among other things as follows:

"Justification for the principle is usually based on the theory that the setting up of a situation or object attractive to minors of tender years is an implied invitation to enter. Certainly the doctrine has as its motivating force sentiment rather than pure reason. However, admitting all this, it must contain some vital and sound force or it would not have made the headway it has. Those courts which have gone the longest distance describe their rule as the humane rule and at the same time refer to the less radical rule as the hard, or Draconian, rule. Much as any court dislikes being accused of lack of humanity, there is a clear duty to avoid being carried away by sentiment. While the courts and legislatures have shown a decided tendency to give additional safeguards to minors of tender years, the responsibility for their care is placed by nature upon their parents."

\* \* \*

"The 'attractive nuisance' doctrine can be carried to such an extent that every owner will be made an insurer against injury caused to a minor by any property, real or personal, that the owner may possess.

Scarcely an object can be named that does not have some attraction for a child and the younger the child the more varied are his inclinations and the objects which appeal to him. To hold that every object that attracts the fancy of any minor under fourteen years of age and is a source of danger to him is an attractive nuisance would certainly not be applying the principle with caution."

Burdick on the Law of Torts, (4th Ed.), page 563, after reviewing a number of authorities, came to this conclusion: "It is quite apparent, therefore, that the tide of judicial opinion is setting strongly against the doctrine of Railroad Company v. Stout. (turntable case). This has been admitted by one of the most enthusiastic advocates of the doctrine." We have referred to the last two authorities merely for the purpose of shedding light on the question as to whether or not liability for negligence in cases of attractive nuisances is always imperative. A number of authorities have held that it is not. It is stated in 38 Am. Jur. 283:

"The doctrine of attractive nuisance applies to municipal corporations in so far as it is applicable in those cases in which municipal corporations are held to be liable for negligence, but, of course, can have no application in cases in which the negligence occurred or the attractive condition was created in the exercise of a governmental function."

In note in 36 A. L. R. 153, it is stated: "A municipal corporation cannot be held liable on the theory of attractive nuisance, where the nuisance was created in the exercise of a governmental function." The following authorities are cited: Hibbard v. Wichita (1916) 98 Kan. 498, L. R. A. 1917A, 399, 159 Pac. 399; Frost v. Topeka (1918) 103 Kan. 197, 173 Pac. 293; Von Almen v. Louisville (1918) 180 Ky. 441, 202 S. W. 880; Dehanitz v. St. Paul (1898) 73 Minn. 385, 76 N. W. 48, 4 Am. Neg. Rep. 655. To the same effect,

see Harland vs. Peaveley, 224 Ky. 338, 6 S. W. 2d 270; Gilliland vs. Topeka, 124 Kan. 726, 262 Pac. 493; Warren vs. Topeka, 125 Kan. 524, 265 Pac. 78, 57 A. L. R. 555. In Frost vs. City of Topeka, supra, a minor was injured by an explosion of dynamite caps left upon the grounds of a detention hospital of a city through the negligence of city employees. It was insisted by counsel for the plaintiff that the facts in the petition showed a right to recover on the ground that the city maintained on the hospital grounds an attractive and dangerous nuisance. The court, holding the city not liable because engaged in a governmental function stated that the principles of law which relieve the city from liability could not be avoided upon any theory of an attractive nuisance. In the case of Bruhnke vs. City of LaCrosse, 155 Wis. 485, 144 N. W. 1100, it was alleged that the city owned and operated certain dump wagons so constructed as to be attractive to children, and dangerous to the children so attracted while the wagon was being dumped; that a child five years of age followed this wagon and came in contact with the chains forming constituent parts of the dumping device just as one of the employees of the city in charge of the wagon, without notice or warning to the plaintiff, negligently disengaged the dumping device, causing the chains moved by such disengagement to move and draw the infant into or against the pulleys through which these chains passed, with great force, seriously injuring the infant. Counsel for the plaintiff, in an action brought against the city, relied upon the turn-table cases (attractive nuisance cases), and also claimed that the city, by using these dump wagons, operated and maintained a nuisance. The court, in holding the city not liable upon either ground stated, among other things, as follows:

"This is a mistaken correlation of distinct and independent rules. When a city creates a nuisance, it is

not exercising a governmental function, but is doing something forbidden by law. When an object is of a construction not forbidden by law, and in a place authorized by law, it is impossible that it should be a nuisance. It is not unlawful to use dump wagons. If mere averment or proof that a useful implement or vehicle was attractive to children would make its use on the streets unlawful, and its presence a nuisance, most of the useful vehicles, implements, and appliances must be withdrawn from the service of mankind. An automobile, a carriage, or a dumping wagon is each attractive to and dangerous to children, and often dangerous even to adults. But that does not make either when in legitimate use a nuisance in the public street."

\* \* \*

"If we assume that there was negligence on the part of the driver or licensee, the city was not responsible for that negligence, because in the care and maintenance of highways the city is exercising a governmental duty, not for its own advantage or gain, but as an administrative agency of the state. . . . There is no such common-law liability as expressed by the maxim respondeat superior in such cases."

It would accordingly seem that the weight of authority is against the holding in the Pennsylvania case of Reichvalder vs. Borough of Taylor, supra.

That the unfortunate accidents to the children involved in this case are to be deplored goes without saying. That there is a great deal of merit in the contention that immunity from liability for negligence on the part of governments and governmental agencies should be abolished cannot be questioned. But whether the courts should do so on their own motion is a matter of grave doubt. While change and stability in the law are forces forever contending with each other, stability in the holdings is expected, if not required, of the courts. Changes made by them from time to time in the law are not surprising only if made merely in-

terstitially. Hence, we naturally hesitate to make a radical change, on our own motion, in the rule of the common law applicable herein, howsoever much we may dislike the rule. To do otherwise would, we fear, go beyond our judicial prerogative. That the rule of immunity from liability in cases like this is not wholly devoid of merit seems to be indicated by the persistent adherence thereto by the courts of England and of many of the states of this country. Whether these merits are outweighed by its demerits is a question which, it would seem, should be settled by the power which controls municipalities in the state and which empowers them to make provisions for the payment of claims which should be paid by them. Judge Wolfe, who disliked the rule of immunity in cases of negligence on the part of municipal agents, stated, in a concurring opinion in the Utah case of Niblock vs. Salt Lake City, supra, as follows:

"Realistically speaking, the state should be free from the vexatious suits based on fictitious grounds which might spring into abundance were the immunity removed. Therefore, the matter of lifting immunity is, perhaps, properly the matter of legislation."

Note a similar tone in the case of Orgeron vs. Louisiana Power and Light Company, 19 La. App. 628, 140 So. 282, 286.

The judgments of the district court in the cases herein will be affirmed.

RINER, C. J. and KIMBALL, J. Concur.